IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

|| 
ROBERT CLARK, ||
|| 
      Petitioner, ||
|| 
vs. || Case No. 09-2093-STA/cgc
|| 
RICKY BELL, ||
|| 
      Respondent. ||
|| 

_____

ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY 12)
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

_____

On February 12, 2009, Petitioner Robert Clark, inmate registration number 341897, an inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee, filed this petition under 28 U.S.C. § 2254. (Docket Entry ("D.E.") 1.) On July 23, 2009, the Court directed Respondent to file the state-court record and to respond to the petition.  On October 1, 2009, Respondent filed an appendix, which includes the transcripts of Clark's state court proceedings. (D.E. 10.) On October 2, 2009, Respondent filed an answer to the petition. (D.E. 11).  On February 9, 2010, Respondent filed a motion for summary judgment. (D.E. 12.)

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

Robert Clark was convicted of second degree murder by a jury in Shelby County Criminal Court. Clark was sentenced to twenty-four (24) years imprisonment to be served at 100% as a violent offender. Clark appealed.  The Tennessee Court of Criminal Appeals affirmed the judgment of the trial court. <u>See</u> <u>State v. Clark</u>, No. W2002-00940-CCA-R3-CD, 2003 WL 21418324 (Tenn. Crim. App. June 18, 2003), <u>perm. app. denied</u> (Tenn. Oct. 27, 2003).

Clark filed a post-conviction petition, alleging that his trial counsel provided ineffective assistance.  After the appointment of counsel an amended petition was filed.  An evidentiary hearing was held and the post-conviction court denied the petition.  Clark appealed and the Tennessee Court of Criminal Appeals affirmed the denial of the petition.  <u>Clark v. State</u>, No. W2007-01440-CCA-R3-PC, 2008 WL 2687699 (Tenn. Crim. App. July 2, 2008), <u>perm. app. denied</u> (Tenn. Dec. 8, 2008).

II.  <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

Petitioner Clark raises the following issues in the petition:

1.   Petitioner's rights were violated under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and <u>Minnick v. Mississippi</u>, 498 U.S. 146 (1990);

2.   The trial court violated the Confrontation Clause by admitting the hearsay testimony of Bobby Marshall, Sergeant Fitzpatrick, Darren Palmore, and Mr. Brommell;

3.   The evidence was insufficient to convict Petitioner of second-degree murder;

4.   The trial court improperly instructed the jury regarding

2

the definitions of mental states pertaining to second degree murder;[1]

5.  Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, by:

    A.  failing to investigate and pursue all possible defenses;

    B.  failing to seek pre-trial suppression of Petitioner's confession;

6.  Appellate counsel rendered ineffective assistance;

7.  Post-conviction counsel rendered ineffective assistance; and

8.  Petitioner was subjected to prosecutorial misconduct during opening statement and closing argument.[2]

## III. RESPONDENT'S ANSWER

Respondent alleges in the answer and motion for summary judgment that issues 1, 2, 6, and 7 were not properly exhausted and are barred by procedural default. Respondent states that issue 7 is also noncognizable. Respondent contends that Petitioner cannot demonstrate that issues 3 and 5 were resolved contrary to applicable Supreme Court precedent or was an unreasonable application of Federal law. The answer and motion do not expressly address claims 4 and 8.

## IV. LEGAL STANDARDS APPLICABLE TO HABEAS PETITIONS

### A. Waiver and Procedural Default

---

[1]  This issue was included as part of ground three in the petition. See D.E. 1 at 8.

[2]  This issue was included in Petitioner's memorandum. See D.E. 1-1 at 5.

3

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

    (A) the applicant has exhausted the remedies available in the courts of the State; or

    (B) (i) there is an absence of available State corrective process; or

       (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. See, e.g., Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); Preiser v. Rodriquez, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust

4

v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).  "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief."  Gray v. Netherland, 518 U.S. 152, 162-63 (1996).  "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'"  Id. at 163 (quoting Picard, 404 U.S. at 278).  A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief."  Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."  Id.  When a petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987).  He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim.  Pillette, 824 F.2d at 497-98.  The claims must be presented to the state courts as a matter of federal law.  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."

Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995)(per curiam)("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review.  Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977).  However, the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue.  Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts, but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred.  Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989);

6

<u>Wainwright v. Sykes</u>, 433 U.S. at 87-88; <u>Rust</u>, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Wainwright v. Sykes</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)(quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

B.   <u>Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State

court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court.  This Court must also determine whether the state court decision on each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

1.   § 2254(d)(1)

The Supreme Court has issued a series of decisions establishing the standards for applying § 2254(d)(1).[3]  In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning.  A state-court decision may be found to violate the "contrary to" clause under two circumstances:

---

[3]   By contrast, there is little caselaw about the standards for applying § 2254(d)(2).

8

A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[4] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but

---

[4]    The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

9

unreasonably applies it to the facts of the particular case."
Cone, 535 U.S. at 694; see also Andrade, 538 U.S. at 75; Williams,
529 U.S. at 409.[5]  "[A]n unreasonable application of federal law is
different from an incorrect application of federal law." Williams,
529 U.S. at 410.[6]  "[A] federal habeas court making the
'unreasonable application' inquiry should ask whether the state
court's application of clearly established federal law was

---

[5]     Although the Supreme Court in Williams recognized, in dicta, the
possibility that a state-court decision could be found to violate the
"unreasonable application" clause when "the state court either unreasonably
extends a legal principle from our precedent to a new context where it should not
apply or unreasonably refuses to extend that principle to a new context where it
should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the
classification does have some problems of precision," id. at 408. The Williams
Court concluded that it was not necessary "to decide how such 'extension of legal
principle' cases should be treated under § 2254(d)(1)," id. at 408-09.  In
Yarbrough v. Alvarado, 541 U.S. 652, 666 (2004), the Supreme Court further
stated:

> Section 2254(d)(1) would be undermined if habeas courts introduced
> rules not clearly established under the guise of extensions to
> existing law. Cf. Teague v. Lane, 489 U.S. 288 (1989). At the same
> time, the difference between applying a rule and extending it is not
> always clear. Certain principles are fundamental enough that when
> new factual permutations arise, the necessity to apply the earlier
> rule will be beyond doubt.

[6]     See also Andrade, 538 U.S. at 75 (lower court erred by equating
"objectively unreasonable" with "clear error"; "These two standards, however,
are not the same.  The gloss of clear error fails to give proper deference to
state courts by conflating error (even clear error) with unreasonableness.");
Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam)(holding that the
lower court "did not observe this distinction [between an incorrect and an
unreasonable application of federal law], but ultimately substituted its own
judgment for that of the state court, in contravention of 28 U.S.C. §
2254(d).");  Cone, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed .
. . , he must do more than show that he would have satisfied Strickland's test
if his claim were being analyzed in the first instance, because under §
2254(d)(1), it is not enough to convince a federal habeas court that, in its
independent judgment, the state-court decision applied Strickland
incorrectly."); Williams, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable
application' clause, then, a federal habeas court may not issue the writ
simply because that court concludes in its independent judgment that the
relevant state-court decision applied clearly established federal law
erroneously or incorrectly. Rather, that application must also be
unreasonable.").

objectively unreasonable." Id. at 409.[7]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." Harris v. Stovall, 212 F.3d 940, 944 (6th Cir. 2000).  As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999)(citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). In determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

    2.   § 2254(d)(2)

---

[7] See also Brown v. Payton, 544 U.S. 133, 147 (2005)("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'")(citations omitted).

Few cases address the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240 (2005).[8]  It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). Rice v. Collins, 546 U.S. 333, 338-39 (2006)("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations

---

[8]    But cf. Rice v. Collins, 546 U.S. 333, 338-89 (2006)(recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

12

are entitled to a presumption of correctness, which is
rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002)

(citing 28 U.S.C. § 2254(e)(1));[9] see also Stanley v. Lazaroff, 01-

4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v.

Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21,

2003)("Though the Supreme Court has not yet interpreted the

'unreasonable determination' clause of § 2254(d)(2), based upon the

reasoning in Williams, it appears that a court may grant the writ

if the state court's decision is based on an objectively

unreasonable determination of the facts in light of the evidence

presented during the state court proceeding.")(citing Torres v.

Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

    C.   Summary Judgment Standard

    Summary judgment "should be rendered if the pleadings, the

discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c)(2). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates
> the entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails to
> make a showing sufficient to establish the existence of
> an element essential to that party's case, and on which
> that party will bear the burden of proof at trial. In

---

[9]     See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981)(applying
presumption of correctness to factual determinations of state appellate
courts).

such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986) (citations omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (same).

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The

judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict"); Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts")(footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. Liberty Lobby, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

V.   ANALYSIS

On direct appeal, Petitioner Clark raised two issues: (1) whether the trial court erred in instructing the jury about the mental state pertaining to second degree murder; and (2) whether the evidence in the record was sufficient as a matter of law to sustain the second degree murder conviction. (D.E. 10-9 at 3.)

During post-conviction proceedings, the amended petition filed by appointed counsel raised multiple issues of ineffective assistance. (D.E. 10-10 at 33-35.) However, during the appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals addressed only two issues of ineffective assistance: (1) failure to investigate and pursue all possible

defenses; and (2) failure to seek pre-trial suppression of Petitioner's confession. (D.E. 10-9 at 110, 112.)

    A.   <u>Issues 1, 2, 4, 6, 7, and 8</u>

<u>Issue 4</u>

Although Petitioner's claim of error in the jury instruction, issue 4 of this petition, was raised on direct appeal, it was determined to be waived because Petitioner did not raise the issue at trial or in the motion for new trial. The Tennessee Court of Criminal Appeals reviewed the claim stating:

> [Clark] argues that the trial court erred in "instructing the jury regarding the definitions of the mental states pertaining to second degree murder" and that the "erroneous instructions effectively lowered the State's burden of proof and denied [Clark] his constitutional right to a unanimous jury verdict."

> To prove second degree murder, the State was required to show that [Clark] "knowingly" killed the victim. As to "knowingly," the trial court instructed the jury by reading Tennessee Code Annotated section 39-11-106(a)(20):

>> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

> [Clark] argues that the trial court's instruction lessened the State's burden of proof for second degree murder because it contained all three definitions of knowingly rather than just the applicable definition for the result-of-conduct offense of second degree murder; namely, [Clark] was aware that his conduct was reasonably certain to cause the death of the victim.

16

To assess this claim, we will review the opinion of this court in <u>State v. Page</u>, 81 S.W.3d 781 (Tenn. Crim. App. 2002), in which the defendant made similar claims as to the trial court's instruction as to "knowingly." The juvenile defendant in <u>Page</u> was tried as an adult and convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. <u>Id.</u> at 782. At trial, the defendant admitted he had swung the bat at the victim, but claimed he did it only to intimidate the victim, had not intended to hit him in the head, and could not believe that he had died. <u>Id.</u> at 785. Defense counsel conceded that the defendant had hit the victim in the head, but argued that the defendant had been intoxicated, was unable to appreciate his conduct, and had " 'no understanding of how wrong it was ... how severe it was at that time.'" <u>Id.</u> In <u>Page</u>, the trial court instructed the jury as to "knowingly" presenting three options: "(1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result." <u>Id.</u> at 786 (emphasis in original). On appeal, the defendant argued, as in the present appeal, that the trial court lessened the State's burden of proof by instructing the jury that the knowing element of second degree murder could be established not only by the defendant's awareness that his conduct was reasonably certain to cause the result, but also by the defendant's awareness that his conduct was of a particular nature or that a particular circumstance existed. <u>Id.</u> at 786. We agreed and remanded the case for a new trial for the jury to be instructed that the knowing <u>mens rea</u> of second degree murder requires that the defendant have acted with an awareness that his actions were reasonably certain to cause the death of the alleged victim. <u>Id.</u> at 790.

In the present appeal, the issue of the jury instructions as to "knowingly" was not raised either during the trial or in the motion for new trial. Accordingly, we may consider this claim, raised for the first time on appeal, only if it constitutes "plain error." Our supreme court adopted, in <u>State v. Smith</u>, 24 S.W.3d 274, 282 (Tenn. 2000), the five factors for identifying "plain error" which earlier had been enunciated in <u>State v. Adkisson</u>, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994):

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error

constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

The court in <u>Smith</u> explained that "the presence of all five factors must be established by the record before this Court will recognize the existence of plain error." 24 S.W.3d at 283. In our review of this matter, we will consider two cases which are procedurally similar to the present appeal.

In <u>State v. Keith T. Dupree</u>, No. W1999-01019-CCA-R3-CD, 2001 WL 91794, at *3 (Tenn. Crim. App. Jan.30, 2001), the trial court had instructed as to "knowingly" utilizing the pattern jury instruction then in effect, which provided that it was established if the person was aware "either: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists." The instructions omitted the part of the "knowingly" definition providing that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." <u>See</u> Tenn. Code Ann. § 39-11-106(a)(20). The court in <u>Dupree</u> explained why the instructional error was not harmless:

> We are unable to find harmless error. The sole issue in this case was whether the killing was knowing or accidental. In other words, the sole issue was whether the defendant was aware that his conduct was reasonably certain to cause the result. Yet, this element was not conveyed to the jury, and a lesser standard was set forth.

2001 WL 91794, at *4.

A further consideration in the court's determination in <u>Dupree</u> that the error in instruction was not harmless was the fact that the jury had asked the trial court the question, "According to the law, does pointing a gun at someone else assume that the person pointing the gun 'knows' that the gun will hurt the other person?" <u>Id.</u> at

18

*5.

In <u>State v. Tony Martin</u>, No. W2001-02221-CCA-R3-CD, 2003 WL 261937, at *8 (Tenn. Crim. App. Feb. 7, 2003), the trial court gave instructions identical to those in the present appeal, and no objection was made either during the trial or in the motion for new trial. The majority determined that the instructional error was harmless, while Judge Joseph M. Tipton, in his concurring opinion, opined that the court could not consider the issue because it did not constitute plain error, for the State had not, in its final argument, utilized the erroneous definitions of "knowingly" and the theories of the parties did not do so either. <u>Id.</u> at *10.

Likewise, we cannot conclude that the instruction of "knowingly" utilized by the trial court in the present appeal constitutes "plain error." Since the record on appeal does not include either the opening statements or closing arguments, we cannot determine to what extent, if any, the parties utilized the superfluous language in the "knowingly" definition. Further, the jury's question as to this definition was not preserved, and we cannot speculate as to what it may have been. However, we note that the trial court instructed the jury as to the lesser offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide, and the defendant fully explained his version of what had happened. By its verdict, the jury rejected his explanation. Because of that fact, as well as the correct definition of "knowingly" having been within the instruction given to the jury, unlike in <u>Dupree</u>, we respectfully disagree that we may consider this issue as "plain error." Accordingly, we conclude that this issue is waived because it was not raised at trial or in the motion for new trial.

<u>State v. Clark</u>, 2003 WL 21418324 at *5-*7.

In determining whether a procedural default has occurred and, if so, what effect the default will have on federal review of a state conviction, the district court must consider whether (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the

state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief." Frazier v. Huffman, 343 F.3d 780, 790 (6th Cir. 2003). "[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case 'clearly and expressly states that its judgment rests on a state procedural bar.'" Id. at 791 (quoting Harris v. Reed, 489 U.S. 255, 263 (1989)). However, even if the state court failed to reject a claim on a procedural ground, the petitioner is also in procedural default "by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006)(quoting O'Sullivan, 526 U.S. at 846-47); see also Deitz v. Money, 391 F.3d 804, 808 (6th Cir. 2004)("A federal court is also barred from hearing issues that could have been raised in the state courts, but were not[.]"). The corollary to this rule is that where a petitioner raised a claim in the state court but in violation of a state's procedural rule, a state court must expressly reject the claim on that procedural ground for a federal court to deem the claim defaulted. See Williams, 460 F.3d at 806(noting that a state court's express rejection of a petitioner's claim on procedural basis and petitioner's complete failure to raise a claim in state court are

20

the two ways a claim can be in procedural default).

In deciding the issue, the Court of Criminal Appeals decision relied on an adequate and independent state ground arising from its interpretation of Tennessee case law and the Tennessee Rules of Appellate and Criminal Procedure. The issue was not addressed during direct appeal because, under Tennessee law, it was waived due to Petitioner's failure to present it during trial or in his motion for a new trial.   The Court of Criminal Appeals decision lacks the necessary federal content to constitute a ruling on the merits of a federal constitutional claim.

Clark fails to demonstrate that issue 4 was addressed by the Tennessee courts as a matter of federal law as required by Pillette, 824 F. 2d at 497-8.  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson, 459 U.S. at 6; Duncan, 513 U.S. at 366.  As raised and addressed by the state courts, issue 4 is noncognizable in this proceeding.  Raised as a federal constitutional claim, the issue is procedurally defaulted and barred from consideration in this forum. This Court must honor the state court's invocation of its procedural bar.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991).

### Issues 1, 2, 6, 7, and 8

Issues 1, 2, and ineffective assistance issues 6 and 7 were never presented to the Tennessee Courts. Further presentation of

these claims in state court is barred by Tennessee's post-
conviction statute of limitations and by Tennessee's one-petition
rule. <u>See</u> Tenn. Code Ann. §§ 40-30-102(a),(c). The issues have
been exhausted through Petitioner's procedural default, and he has
no avenue remaining for presentation of these claims. Petitioner
cannot, therefore, obtain habeas relief on those claims in this
Court. <u>Crank v. Duckworth</u>, 969 F.2d 363, 365-55 (7th Cir.
1992)(holding on appeal after remand that attack on enhancing state
sentence procedurally barred). This procedural default operates as
a complete and independent procedural bar to federal habeas review
of the claims presented. This Court must honor the state court's
invocation of its procedural bar. <u>Ylst</u>, 501 U.S. at 802.

Insofar as the petition may be construed to allege that
ineffective assistance of post-conviction counsel constitutes cause
and prejudice for Clark's default of these claims, "the right to
appointed counsel extends to the first appeal of right, and no
further." <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987). Thus,
counsel's failure to include these issues in the post-conviction
petition, hearing, or appellate brief could not amount to
ineffective assistance that would constitute cause for Clark's
procedural default of his claims in the post-conviction
proceedings. <u>United States ex rel. Johnson v. People of State of
Ill.</u>, 779 F. Supp. 81, 83 (N.D. Ill. 1991). Clark cannot establish
cause and prejudice for his procedural default and presents no

22

tenable claim of factual innocence.   Thus, he cannot avoid the procedural bar and cannot seek federal habeas relief on claims 1, 2, 4, 6, 7, and 8.

   B.   Issue 3: Sufficiency of the Evidence

   Clark alleges that the evidence was insufficient to support his conviction for second degree murder. Respondent asserts that Petitioner cannot show the denial of relief in the state courts was contrary to, or an unreasonable application of, clearly established federal law.

   The Tennessee Court of Criminal Appeals summarized and reviewed the evidence underlying Clark's conviction:

   > During the early morning hours of July 18, 2000, [Clark]'s fiancée, Kimberly Palmore, was found severely beaten at the Cleaborne Temple homeless shelter in Memphis where she and [Clark] had been residing. The victim was transported by ambulance to the Regional Medical Center ("The Med") where she subsequently died on July 26, 2000, as a result of the injuries inflicted upon her.
   >
   > At trial, the victim's brother, Darren Palmore, described the victim's condition when he saw her at the hospital on the afternoon of July 18, 2000:
   >
   > > Her head was swollen like this. Each one of her lips was about that big. The white of her eyes were swollen so bad that her eye lids wouldn't close. She was just swollen all over. She had tubes running all out of her and one of her lungs had collapsed and they had tubes going into her chest.
   >
   > Marion Washington, the general manager at the Taco Bell where the victim worked, testified that [Clark] came to the restaurant daily and stayed all day while the victim was working. When Washington saw the victim at the hospital, she was "swollen all over, just swollen like a balloon" and could not speak.

Officer Carlos Love of the Memphis Police Department testified that he was dispatched to the Cleaborne Temple on July 18, 2000, regarding a disturbance call. He found the victim, who had bruises on her face and was bleeding from her mouth, lying on a mattress. The mattress was covered with blood, and a bloody pillow was lying next to the victim's head when he arrived. Officer Love secured the crime scene and called for an ambulance.

Bobby Lee Marshall, the chief administrator at Cleaborne Temple, testified the victim had been living at the Temple's homeless shelter for about a month and that [Clark] had arrived at about the same time. During the early morning hours of July 18, 2000, Marshall, along with John Blazer and Keith Burrell, conducted a security check in the chapel where about a dozen homeless men and women were sleeping. When they entered the chapel, [Clark], who was nude, jumped up from between some church pews and began apologizing to Marshall, who then heard the victim groan but did not realize she was injured. Believing that [Clark] and the victim were having "like an affair, or something," Marshall told [Clark] to gather his belongings and leave the facility. As Marshall checked on the victim, [Clark] disappeared "in a split second." Marshall found the victim gasping for breath, and he and two others picked up the mattress she was lying on and carried her to the ladies' lounge where it was cooler. Shortly thereafter, the police and an ambulance arrived. Marshall described the victim and [Clark]'s relationship as "ransacked" and said they had had severe problems.

Sheila Saunders testified that she was staying at the Cleaborne Temple shelter on July 18, 2000, and had met the victim there. After being awakened by someone she identified as "Country," Saunders went to the ladies' lounge where she saw the victim lying on a mattress:

> Her shirt was pulled up over her head. Her bra was pulled up here. Her [breast] was showing. Her pants and shorts were at the bottom of her ankles. And blood coming out of the side of her mouth. I notice[d] she had a hole on the side of her head.

An ambulance arrived, and Saunders accompanied the victim to The Med.

[Clark], wearing a torn T-shirt, came to The Med and

24

asked Saunders where the victim was. Saunders told
[Clark] that he was in trouble because he had "raped [the
victim,] ... beat her up and choked her," to which he
replied:

> Hey, I didn't do all that, man, I didn't rape my
> own lady.... I was between the benches fucking and
> she called out Keith's name and I slapped her and
> she got loud at me and I slapped her again and she
> got louder and I put my hand around her and I
> choked her.

Saunders and [Clark] then went outside to talk, and
Saunders told [Clark] that the police were looking for
him. [Clark] left, saying he would return, and Saunders
went back inside to the emergency waiting area. When
[Clark] subsequently returned, he was wearing a different
shirt and was crying and angry. The two again went
outside to talk where [Clark] pulled a gun from
underneath his shirt and said, "Keith and John, man, was
fucking my old lady, man, I'm going to kick Dr.
Marshall's ass.... I got this too ... for that little
nigger fuckin' my gal." Frightened, Saunders asked
[Clark] to put the gun away, and [Clark] put the gun back
under his shirt. They returned to the waiting area inside
the hospital where a doctor informed them they could go
see the victim. As Saunders and [Clark] were walking with
the doctor to the area where the victim was, Saunders
told the doctor that [Clark] had a gun and was the one
who had attacked the victim. The doctor immediately
called for security, and [Clark] took off running.
Saunders saw [Clark] again later that day when the police
were questioning him.

Officer Richard Jewell, Jr., of the Memphis Police
Department testified that he was dispatched to The Med on
July 18, 2000, regarding a prisoner being held by
hospital security. Upon his arrival, Jewell saw [Clark]
who had been handcuffed by Jewell's partner. The officers
then transported [Clark] to the domestic violence bureau.
Asked if he remembered any statements [Clark] had made,
Jewell recalled that [Clark] had said, three times,
"You're not going to convict me of this, because she's
not going to prosecute," although he could not remember
[Clark]'s exact words. No one questioned [Clark] about
the statement. Officer Jewell then identified a property
and evidence bag bearing a tag with the date of July 18,
2000, as well as his name and that of his partner. The

25

bag contained articles of clothing, including a pair of men's blue jeans, a "cut-up white tee-shirt, dirty," a pair of gray boxer shorts, a black leather belt, and a pair of white Nike Air tennis shoes with cream stripes, taken from [Clark].

Beverly Wilson, the manager of inpatient operations at The Med, testified, from medical records, that the victim was admitted to the hospital on July 18, 2000, at 3:10 a.m., for the stated reason of "assaulted" and "numial mediastium pulmonary edema."

Dr. Cynthia Gardner, an assistant medical examiner for Shelby County, testified that she performed the autopsy on the victim on July 26, 2000. The victim's cause of death was "complications of blunt trauma. The complication was that she developed adult respiratory distress syndrome and it was a complication of blunt trauma to both the head and the neck." Dr. Gardner also found a hemorrhage in the deep tissues of the victim's neck which was consistent with strangulation. The victim's injuries included: swelling of the brain; swelling in the soft tissues around the eyes, as well as the eyes themselves; swelling in the chest, neck, and lips; hemorrhaging in the soft tissue in the deep tissue of the scalp all the way down to the bone and even on the surface of the bone; bruising on the upper right cheek, the right corner of the mouth, and on the tongue; bruising of the right upper lip extending into the gum line of the left lower lip and a laceration in the lips; bleeding in the right anterior stapes muscle in the neck and in the soft tissues surrounding the thyroid gland; and adult respiratory distress syndrome which was caused by an inadequate supply of oxygen. All of the victim's autopsy findings "occurred as a result of the blunt trauma to the head and to the neck." Dr. Gardner opined that the deep hemorrhaging was caused by a substantial force to the head and could have been produced by a "very forceful blow with a closed fist." No alcohol or illegal drugs were found in the victim's blood at the time of the autopsy.

Sergeant James L. Fitzpatrick of the Memphis Police Department Homicide Bureau testified that he investigated the victim's death and interviewed [Clark] on July 28, 2000, after advising him of his Miranda rights. [Clark] signed a waiver of rights form after indicating that he understood his rights and then gave a statement which was

reduced to writing and signed and initialed by [Clark]. Sergeant Fitzpatrick was then permitted to read aloud [Clark]'s statement. [Clark] said he had known the victim for almost two years, and they were to be married on August 29, 2000. [Clark] admitted he and the victim had an altercation in the chapel on July 18, 2000, because "they were 'pimpin' her." [Clark] described the altercation:

> I see Kim comin out the lady's area where the women's bathroom was at and I see Dr. Marshall.... So I asked her what was up, what did Dr. Marshall say to you and she said, "nuthin". So I went back into the chapel where we had our mats. So I started talkin to her again. She got angry cause I asked her what was Dr. Marshall askin [sic] her about. So I said, "why you getting loud, we can talk like two grown adults." So I went over where she was at and we started talkin again and she told me don't worry about it, she'll take care of it. So I said, "okay."

> So I started kissin her and foolin around and we had sex and while we was having sex, I say, you must have been with somebody so she got mad again while we was havin sex. She said, "if I tell you, you can't say nuthin but I know won't love me anymore." So I said, "Kim, we can talk about anything, just tell me what's goin on." So she started out by tellin me a date that Dr. Marshall and Keith and John had sent her on. She had to do sexual favors for a guy. She told me that other guys came and I asked her why she didn't tell me that before and she said Dr. Marshall didn't want her to and that he would kick both of us out. Then she said, "he knew everything about me." So we laid down. I laid on my mat and she laid on hers. I said, "you've been with Dr. Marshall haven't you" then she got upset and started fightin. So I grabbed her, pushed her head into the pillow and told her, don't get loud. The[n] I let her up and told her to tell me the truth, what's up. She was still mad and fightin so I grabbed the belt which was on my short pants that was underneath the bench beside her mat. I wrapped the belt around her neck once and choked her and told her don't get loud, we can talk. So I let her up and she told me about Dr. Marshall, Keith and John. Then she got loud again.

I choked her again with the belt that was around her neck. I let go of the belt, loosen it off her neck then I heard her cough. I put my hands over her mouth and wiped her mouth off.

I called her name, Kim, she said, "what", I said, "talk to me" and she said, "what'cha want to know" and then she changed her mind. I hit her two times on the right side of her jaw, I said, "talk to me Kim", she didn't say nuthin, so I tightened the belt up and hit her two more times on the right side of her jaw. I loosened the belt, I heard her gag, I said, "Kim, open your mouth" so I tried to open her mouth. I put my head on her chest, her heart was still beatin but she wasn't breathin good so I blew into her mouth and called her name, "Kim" she was moanin. She grabbed my arm and I put my head down toward her mouth, couldn't understand what she was sayin so I said, "open your mouth, talk" then I heard a noise, someone was comin through the door, it was Dr. Marshall, then I took the belt from around Kim's neck. He saw me and told me to come here and I was still naked and her underpants and pants were off one leg. So I getup, naked, go to Dr. Marshall. He said, "you son of a bitch, I should kill you, why did you do this in this chapel?" Then he said, "get your stuff and get out." I said, "not without her" and he said, "get out" so I went to get my gray short pants and I got the belt but I couldn't find my yellow shirt that I was wearin. Then John escorted me upstairs and Dr. Marshall went into the women's lounge.

Sergeant Fitzpatrick said that [Clark] had been incarcerated since his arrest on July 18, 2000, and that [Clark] first learned of the victim's death on July 28, 2000, the day he gave his statement.

[Clark], testifying as the sole defense witness, said that he and the victim had lived together for about a year and a half before coming to Memphis from Blytheville, Arkansas, in February 2000 and were engaged to be married on August 29, 2000. They came to Memphis to seek medical treatment for the victim's son who was sick with sickle cell anemia and because [Clark] was having problems in Blytheville with his children's mothers and had gotten "caught with other charges over there about a

situation that was going on." When they arrived in
Memphis, they initially lived with two of [Clark]'s
cousins before going to live at the Cleaborne Temple
shelter. The victim went to the shelter around June 15,
2000, and [Clark] went on July 1, 2000.

As to what occurred on July 18, 2000, [Clark] testified
that he went to where the victim was sleeping in the
chapel to "comfort her."[10] The victim told him that Bobby
Marshall and John Brasley had raped her. Hearing this,
[Clark] became upset and asked the victim for details.
When the victim hesitated to respond, [Clark] "hit her,
two or three, maybe four times. But, only on the right
side of her jaw." He next took his belt and "wrapped it
around her neck, just a couple of seconds." The victim
then began telling him what had been happening to her at
the shelter. After hearing a noise, [Clark], who was
nude, told the victim to remain where she was and then
got up to walk around. He encountered Dr. Marshall and
had a brief conversation with him. [Clark] returned to
where the victim was, got his "short pants," and told the
victim he would be right back. He then went upstairs,
packed his bags, and left the shelter. He went "[d]own
the street to an open field," put his bag behind a bush,
and waited for about an hour before returning to the
shelter and waiting for the victim for about thirty
minutes.

[Clark] said he then went to The Med because "I assumed
that it was her, because me and her had an altercation.
Me and her, we did have a fight." He admitted he "hit
[the victim] kind of hard on the jaw." He also admitted
seeing Sheila Saunders at The Med but denied raping the
victim, having a gun, or changing his shirt. [Clark] said
he was arrested that night outside The Med and was taken
to the domestic violence unit. At that time, [Clark]
thought that the victim "had just got beat up, you know,
hit. That was it." He admitted telling the police that
the victim would not prosecute him because she loved him.

State v. Clark, 2003 WL 21418324 at *1-*5.

The Tennessee Court of Criminal Appeals reviewed Petitioner's

---

[10]     On appeal, the defendant's counsel suggests that the defendant's
trial testimony "lacks clarity," and we agree. The defendant's testimony is
difficult to follow and, at times, seemingly contradictory.

challenge to the sufficiency of the evidence and determined:

> [Clark] argues that the evidence was insufficient to support his conviction for second degree murder because there was no proof that he "was aware that his conduct was reasonably certain to cause the death of the alleged victim." He asserts that at most the proof showed that he "should have been aware of high risk that a death might occur."
>
> In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:
>
> > This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.
>
> Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966)(citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption

of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

[Clark] was convicted of second degree murder which is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

In his statement to Sergeant Fitzpatrick, [Clark] testified that he had choked the victim with his belt, loosened it, heard her cough, and hit her twice in the jaw when she did not talk to him. He again tightened the belt around her neck and hit her twice more in the jaw. When he loosened the belt, she "wasn't breathin[g] good." From this testimony, in addition to that of Bobby Lee Marshall, who interrupted the beating, and Dr. Gardner, who said that the victim died as a result of complications of blunt trauma, a reasonable jury could conclude that [Clark]'s severe beating of the victim resulted in her death, which was the foreseeable result of his beating and choking of the victim.

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

State v. Clark, 2003 WL 21418324 at *8-*9.

The Court of Criminal Appeals decision is not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Jackson v. Virginia sets forth the Supreme Court's standard that a petitioner must satisfy to prevail on a sufficiency of the evidence claim:

We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact

31

could have found proof of guilt beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 324 (1979). In making this assessment, the evidence presented at trial must be viewed in the light most favorable to the prosecution. Id. at 319.[11] The Supreme Court's opinion also makes clear that the prosecution in a criminal trial is not "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Id. at 326; see also Holland v. United States, 348 U.S. 121, 137-41 (1955). The Court of Criminal Appeals, expressly referring to Jackson v. Virginia, reviewed the evidence presented at trial and applied that clearly established precedent correctly and in an objectively reasonable manner.

As set forth in the opinion of the Tennessee Court of Criminal Appeals, there is no question that, viewed in the light most favorable to the prosecution, a rational juror could find Clark guilty of second degree murder. The testimony and evidence, including Petitioner's confession and testimony, place Petitioner, who believed the victim had been unfaithful, hitting the victim in the head and choking her with a belt shortly before she was discovered to be unresponsive. (D.E. 10-5 at 89-108, 151-53; D.E. 10-6 at 5.) Petitioner heard the victim choke, gag, have trouble breathing, and moan. (Id. at 102.) He knew that the victim's

---

[11]     The Supreme Court emphasized that a habeas court is not to substitute its own views for those of the jury. Jackson at 318-19.

injuries were severe enough to go to the hospital to look for her. (ID. at 104.) At the hospital, Petitioner admitted to witness Sheila Saunders that he slapped and choked the victim. (D.E. 10-4 at 57, 59, 65.) The medical testimony demonstrated that the victim died as a result of complications of blunt trauma injuries to the head and neck, i.e. strangulation and blows to the head. (D.E. 10-4 at 154, 157; D.E. 10-5 at 19, 21.)

The evidence is more than sufficient to permit the jury to find Clark guilty of second degree murder.   The jury heard the testimony of all the witnesses, including Petitioner Clark. All conflicts in that testimony were resolved against Petitioner.

Even if a possibility existed that Clark could clear the hurdle erected by § 2254(d), this Court would be bound by the Tennessee Court of Criminal Appeals' factual determinations, and those findings require the conclusion that the jury verdict complied with Jackson.   Issue 3 is without merit and is DENIED.

C.   Issues 5A and 5B: Ineffective Assistance of Counsel

Applicable Legal Standards

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was

33

deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a defendant must first demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citation omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1999) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus

34

on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'")(citations omitted).

The Court should "assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); see also Rogers v. Kohler, No. 86-1857, 1987 WL 37783, at *2 (6th Cir. June 23, 1987) ("The habeas lawyer is usually not the trial lawyer and it is very easy for one person's strategy to emerge years later as another person's error. Therefore, we evaluate on the total performance and the question of prejudice.")

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact,

counsel's performance was deficient. Id.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; Johnson v. Bell, 525 F.3d 466, 486-87 (6th Cir. 2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.  In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United States v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369. To prevail on an ineffective assistance of counsel claim, Dowell must satisfy both the deficient performance and prejudice prongs of Strickland. See Harries v. Bell, 417 F.3d 631, 636 (6th Cir. 2005).

## Application

The Tennessee Court of Criminal Appeals summarized the

36

testimony at the post-conviction hearing as follows:

A hearing was held on May 11, 2007, at which only [Clark] and trial counsel testified. [Clark] testified that trial counsel had failed to adequately meet with him, had failed to properly prepare an available defense, and had failed to challenge the admission of his statement to police. According to [Clark], trial counsel only met with him in jail on two occasions and only briefly spoke with [Clark] at his court appearances. [Clark] further testified that he informed trial counsel that his statement to the police was false and was obtained by coercion. He related that, although he informed trial counsel that his statement was coerced, no suppression motion was filed prior to trial. He acknowledged, however, that a motion was filed and a suppression hearing was held following the State's proof, with the motion being denied. Moreover, [Clark] gave very confusing and often conflicting testimony concerning his decision to testify at trial. According to [Clark], trial counsel failed to properly investigate and present evidence in support of a possible theory of defense, that being an intervening cause of death. Specifically, he asserted that Bobby Marshall or someone at Cleaborne Temple could have inflicted further injury on the victim after [Clark] left the Temple or that substandard care by medical professionals at The Med had actually caused the victim's death. [Clark] alleged that trial counsel had failed to find witnesses who were at Cleaborne Temple who could have possibly seen something after [Clarkl]'s departure from the scene. He did, however, acknowledge that trial counsel had obtained the services of an investigator to locate potential defense witnesses. He further faulted trial counsel for failing to introduce evidence regarding charges which were pending at the time against Bobby Marshall for an alleged rape, especially in light of Marshall's inconsistent statements regarding the location where the victim was found. Finally, [Clark] asserted that trial counsel should have spoken with an independent medical expert regarding the possibility of an intervening cause of death, rather than relying upon his discussion with the county medical examiner.

In contradiction to [Clark]'s testimony, trial counsel stated that he met with [Clark] numerous times and discussed the facts of the case with him at length. Trial counsel testified that it was undisputed that [Clark] had confessed to striking and strangling the victim. However,

37

[Clark] insisted that he had not caused the victim's
death. [Clark] informed trial counsel that it was
possible someone else, possibly Bobby Marshall, at
Cleaborne Temple had assaulted the victim a second time
after [Clark] left or that her death had resulted from
the negligent treatment of the attending physicians at
The Med. In response, trial counsel stated that he had an
investigator go to Cleaborne Temple in search of possible
witnesses. The investigator also checked utility records
and other leads provided by [Clark], but the investigator
was unsuccessful in locating any potential witnesses.
Moreover, trial counsel stated that he subpoenaed the
victim's medical records from The Med and reviewed those
records with Dr. Gardner, who performed the autopsy on
the victim. Based upon the medical examiner's statements,
trial counsel did not believe it necessary to conduct any
further investigation into the cause of death of the
victim or to retain an independent expert. Trial counsel
further stated that [Clark]'s assertions with regard to
Bobby Marshall were nebulous at best and that Marshall
had refused to speak with the investigator. Regardless,
trial counsel stated that Marshall had no prior
convictions which could be used for impeachment purposes
and that any pending allegations of misconduct at
Cleaborne Temple were not relevant in the [Clark]'s
trial. Finally, with regard to [Clark]'s statement to the
police, trial counsel testified that [Clark] failed to
inform him that the statement was coerced until
immediately prior to trial. Moreover, although a motion
to suppress was heard during the trial proceeding, trial
counsel stated that it was beneficial to allow [Clark]'s
statement into evidence, as it contained certain
statements which aided [Clark]'s defense. Finally, trial
counsel testified that he tried to follow every lead and
to investigate all possible defenses, although he
eventually defended upon the ground that the crime was,
at best, manslaughter, based upon [Clark]'s statement
that the two had engaged in a heated argument prior to
the homicide.

At the conclusion of the hearing, [Clark]'s petition for
post-conviction relief was denied. This timely appeal
followed.

Clark v. State, 2008 WL 2687699 at *3-*4.

The Tennessee Court of Criminal Appeals analyzed Petitioner's

claims of ineffective assistance under Strickland stating:

> On appeal, [Clark] argues that the post-conviction court
> erred in finding that he was not denied his Sixth
> Amendment right to the effective assistance of counsel.
> To succeed on a challenge of ineffective assistance of
> counsel, [Clark] bears the burden of establishing the
> allegations set forth in his petition by clear and
> convincing evidence. Tenn. Code Ann. § 40-30-110(f)
> (2006). [Clark] must demonstrate that counsel's
> representation fell below the range of competence
> demanded of attorneys in criminal cases. Baxter v. Rose,
> 523 S.W.2d 930, 936 (Tenn. 1975). Under Strickland v.
> Washington, 466 U.S. 668, 687 (1984), a petitioner must
> establish (1) deficient performance and (2) prejudice
> resulting from the deficiency. The petitioner is not
> entitled to the benefit of hindsight, may not
> second-guess a reasonably based trial strategy, and
> cannot criticize a sound, but unsuccessful, tactical
> decision made during the course of the proceedings.
> Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App.
> 1994). This deference to the tactical decisions of trial
> counsel is dependent upon a showing that the decisions
> were made after adequate preparation. Cooper v. State,
> 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).
>
> It is unnecessary for a court to address deficiency and
> prejudice in any particular order, or even to address
> both if the petitioner makes an insufficient showing on
> either. Strickland, 466 U.S. at 697. In order to
> establish prejudice, the petitioner must establish a
> "reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would
> have been different. A reasonable probability is a
> probability sufficient to undermine confidence in the
> outcome." State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)
> (quoting Strickland, 466 U.S. at 694).
>
> The issues of deficient performance by counsel and
> possible prejudice to the defense are mixed questions of
> law and fact. Id. at 461. "[A] trial court's findings of
> fact underlying a claim of ineffective assistance of
> counsel are reviewed on appeal under a de novo standard,
> accompanied with a presumption that those findings are
> correct unless the preponderance of the evidence is
> otherwise." Fields v. State, 40 S.W.3d 450, 458 (Tenn.
> 2001) (citing Tenn. R. App. P. 13(d); Henley v. State,
> 960 S.W.2d 572, 578 (Tenn. 1997)). However, conclusions

of law, are reviewed under a purely de novo standard with no presumption that the post-conviction court's findings are correct. Id.

On appeal, [Clark] argues that the evidence presented at the post-conviction hearing preponderates against the court's finding that trial counsel's performance was not below the standard set forth in Baxter v. Rose with regard to the investigation of the case and possible theories of defense. Specifically, [Clark] "maintains his contention that there was an intervening cause of death," which should have been investigated. He asserts that "the intervening cause of death was either actions taken by Bobby Marshall or medical malpractice." According to [Clark], if "these theories [had] been proper[l]y investigated and fully litigated at trial [t]he results of the trial may very well have been different." Additionally, [Clark] contends that trial counsel was ineffective by failing to file a motion to suppress [his] statement to police until well after the trial was underway. He contends that this error "affecte[ed] the very foundation of [Clark's] trial strategy[,][and][t]he decision on whether to testify on his ... own behalf."

In its written order denying post-conviction relief, the court found, in relevant part, as follows:

> [Clark's] complaint that counsel erred by failing to meet adequately with [him] prior to trial and failed to adequately interview [him] regarding possible defenses is unfounded....
>
> ... This Court resolves issues of credibility against [Clark] and accredits the testimony of trial counsel.... [Clark] is not worthy of belief.
>
> [Clark] does not specify what other defenses counsel should have pursued. [Clark] testified that he wanted trial counsel to "seek the truth and that someone might have come up with the truth". [Clark] essentially wanted trial counsel to prove that "it's a possibility that someone else did this". Trial counsel testified that [Clark] rejected all offers and insisted that [Clark] did not kill anyone. Trial counsel testified that the only defense was Voluntary Manslaughter as [Clark] claimed that the victim had angered [Clark] during sex by allegedly admitting to having sexual

40

relations with other men. [Clark's] theory was
either someone else killed the victim at Cleaborne
Temple or that medical treatment was inadequate.
Trial counsel pursued all angles but correctly
concluded that [Clark's] theories were mere
speculation.

[With regard to the motion to suppress, it] was not
heard before trial as [Clark] never complained
about an involuntary statement to trial counsel.
Trial counsel testified that [Clark] raised an
involuntary statement shortly before trial. Trial
counsel saw no reason to file any additional
motions as trial counsel "did not want to tip his
hand to the state". The trial court heard and
denied [Clark's] motion to suppress. [Clark]
admitted at his evidentiary hearing that he lied to
the trial court during sentencing and during the
suppression hearing. [Clark] also lied in his
evidentiary hearing. [Clark] testified under oath
that he decided not to testify at trial after the
trial court denied his motion to suppress. The
trial record shows clearly that [Clark] lied again
as [Clark] did in fact testify at trial.

       ....

... [With regard to possible defenses, trial
counsel] testified that [Clark's] statements were
"nebulous" and that "[Clark] was sending us on
fishing expeditions and we went fishing". [Clark]
wanted trial counsel to "go out and see what you
could find". As testified [to] at the evidentiary
hearing, trial counsel and his investigator did the
best that they could.

       ....

[With regard to trial counsel's decision not to
seek independent review of the victim's medical
records,] [t]rial counsel testified that he did not
see a particularized need to ask for an expert
witness to review the findings of the Medical
Examiner's Office. [Clark's] theory of defense was
wholly speculative; someone else could have beaten
the victim after [Clark] was evicted from the
Temple or that the victim received negligent
medical treatment. Trial Counsel testified that he

reviewed the medical records with Dr. Cynthia Gardner and that she was very helpful. Trial counsel testified further that he believes that the Assistant Medical Examiner is an independent and objective medical expert whose findings were not all one sided. Trial counsel insisted that there were no medical factors that indicated that the victim received negligent medical care....

Further, [Clark] had admitted that he struck and choked the victim. Pneumonia and liver infection contributed to the cause of death of this victim and were related to the injuries that [Clark] admitted committing against the victim. Dr. Gardner saw nothing in the victim's medical records that would have indicated that the victim received inadequate medical treatment. [Clark] has failed to produce at his evidentiary hearing any medical proof that contradicts the findings and testimony of Dr. Gardner. Therefore, this issue is also without merit.

Following review, we find nothing in the record which preponderates against the post-conviction court's extensive findings. Clearly, the court accredited the testimony of trial counsel and wholly discounted the testimony of [Clark], whom he found to be untruthful on multiple occasions. As conceded by [Clark], issues of credibility of witnesses and the weight to be given their testimony are to be resolved by the trier of fact. See Henley, 960 S.W.2d at 579. It is not the province of this court to reweigh such determinations.

When a petitioner in a post-conviction proceeding alleges that trial counsel was deficient in failing to pursue a motion to suppress or perform in a specific manner, it is the petitioner's burden to establish by clear and convincing evidence (1) the motion to suppress would have been granted and that the petitioner's allegation of deficient performance has merit; and (2) that had trial counsel performed as suggested, there is a reasonable likelihood the result would have been different. Clearly, counsel cannot be considered ineffective for failing to pursue a motion that is without merit. In this case, [Clark] has failed in both respects with regard to his required burden of proof.

Based upon the foregoing, the Shelby County Criminal

Court's denial of post-conviction relief is affirmed. <u>Clark v. State</u>, 2008 WL 2687699 at *4-*7.

<u>Issue 5A: Counsel's Failure to Investigate and Pursue all Possible Defenses</u>

Respondent contends that Clark fails to demonstrate that the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law or that is was based upon an unreasonable determination of the facts in light of the evidence presented during post-conviction proceedings.

At the post-conviction evidentiary hearing, Petitioner Clark testified that he asked trial counsel to investigate Bobby Marshall, CEO of the Cleaborne Temple, for the crime because Marshall had pending charges for rape, carrying a weapon in the courtroom, and unlawful possession of a weapon. (D.E. 10-12 at 16-20.) Clark also testified that he requested that counsel investigate the other residents at the Cleaborne Temple, but admitted that they were hard to locate because they were homeless. (<u>Id.</u> at 19-21.) On cross-examination Clark testified that he also asked his trial attorney to investigate whether medical malpractice had caused the victim's death and he admitted that counsel subpoenaed the victim's medical records. (<u>Id.</u> at 53-54.)

The post-conviction trial court pointed out that Clark possessed notes that demonstrated that trial counsel looked for

43

witnesses for months before trial and Clark's post-conviction testimony that counsel did not try to locate witnesses until the week before trial was untrue. (Id. at 71-72.) Clark admitted that post-conviction counsel had also tried to locate the witnesses and that, even on the date of the hearing, Clark could offer no further information to the court to assist in locating witnesses. (Id. at 78.) Petitioner also admitted that his own defense strategies were mere speculation. (Id. at 80-81.)

Trial counsel testified that he attempted to find witnesses for Petitioner Clark despite Clark not relating any names. (Id. at 99.) Counsel described the difficulty in obtaining a list of residents of Cleaborne Temple. (Id. at 99-100.) Counsel testified that Clark admitted:

> from the beginning that he had beaten and strangled Ms. Palmore, but he said he didn't think he had done it badly enough to send her to the Med. He thought it was possible that some other people may have assaulted her after he did and after he left the Temple that night. And he wanted me to find out if there were any, but he didn't give me any specific people who had specific knowledge.

(Id. at 100.) Counsel also stated that because Clark "didn't think [the victim] was injured very badly, that he thought the doctors at The Med may have been - may have contributed to her death through some sort of malpractice." (Id.) Counsel reviewed the medical records with the pathologist and found no evidence to support that theory. (Id. at 100-02, 112.) Counsel testified that Witness Bobby Marshall had not been convicted of a crime at the time of Clark's

trial, he could find no evidence with which to impeach Marshall, and Marshall refused to speak with them. (<u>Id.</u> at 104, 111, 118.) Counsel also recalled that one person interviewed thought that Marshall was, in fact, a homosexual. (<u>Id.</u> at 128.)

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on <u>Strickland</u>, the relevant Supreme Court precedent governing claims of ineffective assistance. The Court of Criminal Appeals applied that clearly established precedent correctly and in an objectively reasonable manner. Applying <u>Strickland</u>, the state court determined that counsel was not deficient.

Based on this Court's review of the transcript of testimony during the post-conviction hearing, including trial counsel's testimony, the decision of the Tennessee Court of Criminal Appeals did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. <u>Id.</u>, § 2254(e)( 1). Clark presents no such evidence and no argument that overcomes the presumption. He is not entitled to relief on this issue.

Issue 5B: Counsel's Failure to Seek Pre-Trial Suppression

of Petitioner's Confession

At the post-conviction evidentiary hearing, Clark testified

about his objection to the admission of his confession as follows:

> It came to my attention ... before my trial ...the dates
> and the time of the incident and the time didn't match up
> when they took the statement from me and I kept on
> telling them that it was two different statements, which
> they only presented one at my trial and that was the one
> that said 3:45 but it was another one that was supposed
> to have said 6:30 p.m. And that was inaccurate, you know
> what I'm saying, because the dates - the time didn't
> match up. Then it had, you know what I'm saying, on it,
> you know, that a homicide was committed at the Temple
> when the homicide wasn't. It was an altercation that
> occurred at the Temple, not a homicide.

(D.E. 10-12 at 10.)

Officer James Fitzpatrick testified during the suppression

hearing during trial that the oral interview with Clark concluded

about a quarter to four on July 28, 2000, and the documents were

presented to the transcriptionist in preparation for taking Clark's

statement, but the written statement did not start until 6:30 p.m.

(D.E. 10-5 at 51-52.) Fitzpatrick stated that the time on the

statement was "overlooked instead of chang[ed] to 6:30" and was

actually the time for the conclusion of the oral interview. (Id. at

52.) The trial transcript contains no testimony about a second

written statement.

Clark testified that he told trial counsel that his confession

was not true and was coerced. (D.E. 10-12 at 12.) Clark testified

that he made his decision not to testify after the motion to

46

suppress was denied during the trial. (<u>Id.</u> at 14.) During questioning by the post-conviction court, Clark denied that counsel discussed with him the strategic reasons for allowing the admission of his statement into evidence. (<u>Id.</u> at 82-83.) Clark admitted he ultimately changed his mind and testified at trial. (<u>Id.</u> at 84-85.)

Trial counsel testified that if Clark had told him that his statement was coerced or inaccurate, he would have filed a motion to suppress, but as he recalled, Clark brought the issue up "rather late, maybe right before the trial." (D.E. 10-12 at 105.) In answer to questions by the post-conviction court, trial counsel stated that he "certainly" would have filed a motion to suppress before trial if Clark had told him his statement was involuntary or coerced and Clark did not do that. (<u>Id.</u> at 133-34.)

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. 28 U.S.C. 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on <u>Strickland</u>, the relevant Supreme Court precedent governing claims of ineffective assistance. This Court, after reviewing the Court of Criminal Appeals decision and the state court record as a whole, is persuaded that the state court applied that clearly established precedent correctly and in an objectively reasonable manner to the facts of this case.

Clark disagrees with the Tennessee Court of Criminal Appeals determination that counsel was not ineffective either for failing

to move to suppress his confession before trial. This Court has reviewed the trial testimonies of Officer Fitzgerald and Petitioner Clark, (D.E 10-5 at 53-80), as well as the transcript of postconviction testimony, and concludes that the decision of the Tennessee Court of Criminal Appeals did not "result[ ] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. Id., § 2254(e)(1). Clark presents no facts here, demonstrating that any facts, motion, or argument existed that would have prevented the admission of his pre-trial confession. Issue 5B is also without merit.

Because Petitioner's claims are procedurally barred and devoid of substantive merit, disposition of this petition without an evidentiary hearing is proper. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. For all the foregoing reasons Respondent's motion for summary judgment (D.E. 12) is GRANTED and the petition is DISMISSED.

## VI.   Appellate Issues

The Court must also determine whether to issue a certificate of appealability ("COA"). Twenty-eight U.S.C. § 2253(a) requires a district court to evaluate the appealability of its decision

48

dismissing a § 2254 habeas petition and to issue a certificate of appealability ("COA") only if "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997)(district judges may issue certificates of appealability).  No § 2254 petitioner may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"  Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed.  Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief.  The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail.  It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief.  After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

49

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>, 463 U.S. at 893).   Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also</u> <u>id.</u> at 342 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[12]

In this case, the issues presented by Petitioner's petition are procedurally barred or without merit for the reasons previously stated.   Because he cannot present a question of some substance about which reasonable jurists could differ, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2254 petitions.   <u>Kincade v. Sparkman</u>, 117 F.3d 949, 951 (6th Cir. 1997).   Rather, to appeal <u>in forma pauperis</u> in a § 2254 case, and thereby avoid the $455 appellate filing fee

---

[12]   The Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue."   <u>Id.</u> at 337.   Instead, the COA requirement implements a system of "differential treatment of those appeals deserving  of attention from those that plainly do not."   <u>Id.</u>

required by 28 U.S.C. §§ 1913 and 1917, Petitioner must seek permission from the district court under Federal Rule of Appellate Procedure 24(a).  <u>Kincade</u>, 117 F.3d at 952.  Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1).  However, Rule 24(a) also provides that, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal <u>in forma pauperis</u>, Petitioner must file his motion to proceed <u>in forma pauperis</u> in the appellate court.  <u>See</u> Fed. R. App. P. 24(a) (4)- (5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.  It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal <u>in forma pauperis</u> is DENIED.  If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed <u>in forma pauperis</u> and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 29th day of September, 2010.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE